MANATT, PHELPS & PHILLIPS, LLP
ANDREW A. BASSAK (Bar No. CA 162440)
E-mail: ABassak@manatt.com
CHRISTIE BAHNA (Bar No. CA 295143)
E-mail: CBahna@manatt.com
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
Telephone: (415) 291-7400
Facsimile: (415) 291-7474

Attorneys for Plaintiff
CHARLES RUSSELL SPEECHLYS, LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CHARLES RUSSELL SPEECHLYS LLP, an English Limited Liability Partnership,

Plaintiff,

vs.

WHITE OAK GLOBAL ADVISORS, LLC, a Delaware limited liability company,

Defendant.

Case No. 3:17-cv-00474

**COMPLAINT FOR:**

1. **Breach of Contract**
2. **Book Account**
3. **Services Performed**
4. **Account Stated**
5. **Quantum Meruit**

**DEMAND FOR JURY TRIAL**

Plaintiff Charles Russell Speechlys LLP ("CRS") hereby alleges as follows:

**THE PARTIES**

1. CRS is an English law firm with its principal place of business in London, England.

2. CRS is informed and believes, and on that basis alleges, that Defendant White Oak Global Advisors, LLC ("White Oak") is a financial consulting firm with its principal place of business located at Three Embarcadero Center, Suite 550, San Francisco, California, 94111.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

4. Venue for these claims is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to CRS's claims occurred in this District and because White Oak's principal place of business is within this District.

**GENERAL ALLEGATIONS**

5. White Oak is a financial consulting firm focused on direct lending and specialty finance.

6. In late 2015, White Oak retained the professional services of CRS in connection with its participation in the confidential auction sale of certain UK, French, and German asset-based lending businesses of a multinational corporation, specifically, the UK arm of that group (the "Project").

7. On October 12, 2015, CRS sent White Oak a Letter of Engagement to set for the setting forth the terms and conditions under which CRS would provide its professional services (the "Engagement Letter").

8. Work on the Project was intense from the outset, and White Oak soon

asked CRS to provide services beyond the initial scope of work. CRS agreed to perform and performed the requested services.

9. In November and December of 2015, CRS provided White Oak with periodic updates as to the legal fees White Oak was incurring. On November 9, 2015, CRS advised White Oak by email that White Oak had incurred legal fees of approximately £140,000. On November 30, CRS advised White Oak by email that as of November 26, White Oak had incurred cumulative legal fees of approximately £189,750 (exclusive of disbursements). On December 17, CRS advised White Oak that amount of legal fees outstanding had continued to increase materially.

10. On November 4, 2015, White Oak and CRS discussed the addition of an initial "uplift/discount arrangement" to the terms of CRS's Engagement Letter. By email exchange later that day, they agreed to the following arrangement: If the Project transaction did not close, CRS would discount its fees; if the transaction closed, White Oak would make an "uplift" or bonus payment to CRS.[1]

11. On December 21, 2015, CRS advised White Oak by email that White Oak had incurred cumulative legal fees (exclusive of costs) of approximately £335,000, and included a detailed description of CRS's services rendered to that date.

12. On or about December 24, 2015, as a result of the joint efforts of White Oak and its advisors, including CRS, White Oak achieved a Project milestone when White Oak obtained an exclusivity agreement from the seller for a period during which White Oak would have the exclusive right to negotiate definitive documents for the Project transaction. White Oak and CRS continued to work to negotiate definitive documents for the Project transaction in January and February, 2016.

13. White Oak's Managing Partner Barbara J. S. McKee countersigned

---

[1] During this discussion, White Oak also raised the possibility of capping the total fees CRS would incur for a specified scope of work, but no agreement was reached on that term.

CRS's engagement letter and returned it to CRS on January 8, 2016, with a cover email formalizing White Oak's request for a cap on CRS's aggregate fees for the Project and proposing an extension and revision to the "uplift/discount arrangement." Attached hereto as Exhibit A is a true and correct copy of the Engagement Letter, redacted only to maintain the confidentiality of the Project.

14. On February 9, 2016, CRS advised White Oak by email that as of that date White Oak had incurred cumulative legal fees of approximately £490,000 (exclusive of disbursements). On or about February 10, 2016, CRS and White Oak finalized an "uplift/discount arrangement" on the following basic terms:

- Based upon an agreed scope of work, CRS's legal fees (excluding disbursements and any VAT) would be capped at US$950,000.
- If the Project transaction closed, White Oak agreed to pay CRS an "uplift" or bonus in an amount equal to 15% of CRS's legal fees for the Project, up to a maximum "uplift" or bonus of $142,500 (i.e. 15% of the $950,000 maximum basic fees, which would be payable in addition to the basic fees).
- If the Project transaction failed to close, CRS agreed to reduce the amount of its fees in an amount equal to 15% of CRS's legal fees for the Project, up to a maximum discount of $142,500 (i.e. 15% of the $950,000 maximum basic fees).
- Prior to any "uplift" or discount, CRS would deduct £5,000 from the total amount of its legal fees.
- CRS would invoice White Oak at closing or upon termination of negotiations for the Project transaction.

15. In reliance on White Oak's representations and agreements, CRS continued to provide professional services to White Oak on the Project through February 2016.

16. On or about February 23, 2016, the seller terminated negotiations with

White Oak on the Project transaction due to significant disagreements between the parties on material commercial terms.

17. After learning that the seller had terminated the Project transaction, CRS contacted White Oak to discuss payment for its services. On March 31, 2016, CRS issued its Invoice No. 216032279 to White Oak for CRS's professional fees and disbursements for CRS's work on the Project in the total amount of £525,958.12 (the "Invoice").

18. As CRS and White Oak previously agreed, the amount of the Invoice reflected a deduction of £5,000, and the further fifteen percent (15%) discount off the total amount of professional fees incurred.

19. Despite repeated demands, White Oak has refused and continues to refuse to pay the amounts invoiced by CRS.

20. Due to White Oak's failure to honor its agreement to pay CRS timely, on May 18, 2016, CRS issued a Final Demand, indicating that interest was accruing on the outstanding amount in accordance with Section 7.1.3 of the Engagement Letter.

21. On November 7, 2016, CRS, by and through its outside counsel, issued a letter demanding payment. That letter included the following text:

> As you are aware, Section 20 of the Standard Terms of the Engagement Letter provides, among other things, that the Engagement Letter is subject to the exclusive jurisdiction of the Courts of England. If White Oak does not pay all amounts past due to CRS on or before November 11, 2016, CRS will commence legal proceedings to collect its unpaid invoice. To expedite collection, however, unless White Oak indicates to me in writing on or before November 11, 2016, that White Oak will confirm its consent to the jurisdiction of the Courts of England, will appear in England to litigate this matter on the merits, and will respect all decisions rendered by the Courts of England, CRS will institute legal action against White Oak in California.

22. White Oak did not respond.

**FIRST CAUSE OF ACTION**

**(Breach of Contract)**

23. CRS incorporates the allegations of paragraphs 1 through 22 of this Complaint as if fully set forth herein.

24. The Engagement Letter between CRS and White Oak, as amended and supplemented by the "uplift/discount arrangement," is a binding and enforceable contract, supported by valuable consideration.

25. CRS performed substantially all of its obligations pursuant to the terms and conditions of the Engagement Letter, as it rendered professional services to White Oak in connection with the Project.

26. Pursuant to Section 7.1 of the Engagement Letter, White Oak is to pay CRS's invoice "within 30 days after it is delivered."

27. Section 7.1.3 of the Engagement Letter provides that if CRS is not paid within 30 days, CRS may charge interest at a rate of eight percent (8%).

28. As described above, White Oak has materially breached its obligations under the Engagement Letter by failing to pay CRS timely, and by continuing to refuse to pay CRS for services rendered and disbursements advanced as agreed.

29. As a direct and proximate result of White Oak's material breaches, CRS has suffered substantial monetary damages in an amount not less than £525,958.12 (plus interest, which continues to accrue daily).

WHEREFORE, CRS prays for relief as set forth below.

**SECOND CAUSE OF ACTION**

**(Book Account)**

30. CRS realleges and incorporates by reference paragraphs 1 through 29, inclusive, as though fully set forth herein.

31. CRS keeps a detailed statement constituting the principal record of costs advanced and fees for the legal services provided to White Oak described in

this Complaint. The book account reflecting these fees, costs and payments thereon was made in the regular course of business by CRS and is kept in a reasonably permanent form.

32. Pursuant to this book account, Defendants are indebted to CRS in an amount in excess of the jurisdictional limit of this Court, but not less than £525,958.12.

WHEREFORE, CRS prays for relief as set forth below.

## **<u>THIRD CAUSE OF ACTION</u>**

### **(Common Count for Services Performed)**

33. CRS realleges and incorporates by reference paragraphs 1 through 32 inclusive, as though fully set forth herein.

34. White Oak is indebted to CRS in an amount in excess of the jurisdictional limit of this Court, but not less than £525,958.12, for legal services performed and costs advanced by CRS at White Oak's request.

WHEREFORE, CRS prays for relief as set forth below.

## **<u>FOURTH CAUSE OF ACTION</u>**

### **(Account Stated)**

35. CRS realleges and incorporates by reference paragraphs 1 through 34 inclusive, as though fully set forth herein.

36. In approximately March, 2016 White Oak became indebted to CRS in the total amount of £525,958.12.

37. On or about March 31, 2016, a total account was stated in a written invoice from CRS to White Oak. On this invoice, a total balance of £525,958.12 was found due to CRS from White Oak.

38. Despite CRS demands to White Oak for payment, White Oak has not paid all or any part of the amounts it owes to CRS.

39. There is now due, owing, and unpaid from White Oak to CRS the sum of US £525,958.12, plus interest.

40. CRS has incurred legal fees in connection with this matter, in an amount to be determined at trial.

WHEREFORE, CRS prays for relief as set forth below.

**FIFTH CAUSE OF ACTION**

**(Quantum Meruit)**

41. CRS incorporates the allegations of paragraphs 1 through 40 of this Complaint as if fully set forth herein.

42. White Oak received a benefit from CRS in the form of legal and professional consulting services rendered by CRS at White Oak's specific request.

43. As described more fully above, White Oak received these benefits in exchange for its commitment to compensate CRS for those services.

44. It would be unjust and/or against the fundamental principles of justice or equity and good conscience for White Oak to retain the benefit of CRS's services at the expense of CRS.

WHEREFORE, CRS prays for relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, CRS prays for judgment against White Oak on CRS's First, Second, Third, and Fourth Causes of Action, as follows:

1. For damages in an amount according to proof, but not less than £525,958.12; and

2. For prejudgment interest.

WHEREFORE, CRS prays for judgment against White Oak on CRS's Fifth Cause of Action, as follows:

1. Restitution in an amount to be proven at trial.

///

///

///

///

WHEREFORE, CRS prays for judgment against White Oak on all of CRS's Causes of Action, as follows:

1. For Plaintiff's attorneys' fees and costs in accordance with UK law;
2. For such other and further relief as the Court deems just and proper.

Dated: January 30, 2017

MANATT, PHELPS & PHILLIPS, LLP

By: ______________________
Andrew A. Bassak
*Attorneys for Plaintiff*
CHARLES RUSSELL SPEECHLYS, LLP

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.

Dated: January 30, 2017

MANATT, PHELPS & PHILLIPS, LLP

By: ______________________

Andrew A. Bassak
*Attorneys for Plaintiff*
CHARLES RUSSELL SPEECHLYS, LLP

# EXHIBIT A

**Our Ref:** HP/CDB/200948/00001
**Your Ref:**

CharlesRussell Speechlys

**Strictly Private and Confidential**
Mr Tom Otte
Managing Director, Head of Asset Based Lending
White Oak Global Advisors, LLC
3 Embarcadero Center
Suite 550
San Francisco
CA 94111
USA

**Charles Russell Speechlys LLP**
5 Fleet Place London
EC4M 7RD UK
T: +44 (0)20 7203 5000
F: +44 (0)20 7203 0200
DX: 19 London/Chancery Lane
**charlesrussellspeechlys.com**

hamish.perry@crsblaw.com
**D:** +44 (0)20 7203 5392
**F:** +44 (0)20 7070 0358

**By Email**
TOtte@whiteoaksf.com

12 October 2015

*Legal Instructions*

Dear Tom

**LETTER OF ENGAGEMENT**

Thank you for instructing us to act for White Oak Global Advisors, LLC. Our work will be undertaken on the terms set out in this letter and the attached Standard Terms, together with any other terms expressly agreed at any time in writing by a partner of ours. We are required to set out these terms in detail, so please excuse the formality of the documents and please read them carefully.

1 **SCOPE OF OUR WORK**

The scope of our work will in summary comprise a review of the tender documentation from regarding a potential sale of UK, French and German Asset Based Lending Business and advising you on your letter of interest ("**LOI**") in respect of the UK Asset Based Lending Business prior to submission on or before 13 October 2015.

If you require us to assist with any later part of the sale process, we will happily agree with you at the time the scope of such further involvement.

We will not advise on laws other than English law and the laws of the European Union as they apply in England.

2 **TIMESCALE**

The deadline for submission of the LOI is 5pm (GMT) on 13 October 2015. As such we would imagine that our assistance with the LOI will have concluded by such time. We shall endeavour to deal with the matter expeditiously and will keep you up to date with progress including likely timescales.

3 **WHO WILL DO THE WORK**

I will supervise the work and will be your main point of contact. My partners, David Hicks (Corporate - Financial Services) and Paul Kay (Banking), may also be involved in the matter. If others here

CRS
CharlesRussell Speechlys

have any significant involvement, for example to deal with specialist points or provide cover during absences, we will discuss this with you first whenever possible.

We may outsource certain support services to external service providers under obligations of confidentiality.

## 4 OUR FEES

We have agreed a fee in the region of £2,000 - £2,500 (plus any VAT and disbursements) for this matter, based on the Assumptions and Matters in paragraph 8. If the matter or our work on it is not completed for any reason, our fees will be based on the hourly rates set out below.

In the event that we are required to assist with any later part of the sale process, we will discuss with you the connected fee arrangements before we start such work.

The hourly rates of those who we expect will do the work are:

| | |
|---|---|
| Hamish Perry | £450 |
| David Hicks | £435 |
| Paul Kay | £570 |

If others do significant work on the matter, we will endeavour to tell you and inform you of their hourly rate and agree any additional costs with you.

Hourly rates are normally reviewed annually with changes brought into effect from 1st May. Changes in hourly rates will be notified. We record our time in six minute units.

Where more than one person is our client, liability for our charges is joint and several.

## 5 OTHER CHARGES, EXPENSES AND DISBURSEMENTS

These will be added to our fees and, unless they are unusual, we will proceed on the basis that we have your authority to incur them. However, you will normally be consulted before we instruct Counsel, experts or other professional people at your expense unless we state that the amount you will be charged includes those other costs.

**Other Charges**

Photocopying and printing - 20p (or £1 for colour) per A4 sheet.

Telegraphic transfer (CHAPS) fees – up to £30 which includes the bank charge that we pay.

A reasonable administration fee may be added to the cost of certain searches such as Company Searches.

**Expenses**

Expenses such as travel and subsistence, significant telephone call charges, and other expenses incurred on goods and services procured for your benefit, are charged at cost, except for travel by car, where a mileage charge (reflecting HMRC rates) applies.

Postal charges, minor telephone and fax costs and secretarial services are included in our general fees.

CRS
CharlesRussell Speechlys

**Disbursements**

These include items such as the fees of Counsel, experts or other professional people and will be charged at cost.

6 **VAT**

VAT at prevailing rates will be added to sums billed to you where applicable.

7 **BILLING AND PAYMENT INFORMATION**

We will render our bill for the work carried out to date later this month. If we are required to carry out any further work, then we will render bills monthly in arrears.

Our payment terms provide for settlement within 30 days. Unless we have specifically agreed otherwise in writing, we will not be bound to pay any other charges, expenses or disbursements (other than small amounts) unless we have received funds from you.

*Unless with our prior agreement a third party guarantees payment of our fees*, we will not *normally* accept payment of sums from a third party that is not a financial institution providing finance in the ordinary course for the transaction. Also, we may need to carry out additional due diligence where we receive funds from third parties, which may result in your matter being delayed.

8 **ASSUMPTIONS AND MATTERS WE HAVE TAKEN INTO ACCOUNT**

Our engagement (including any fee estimates and the likely timescales) is, and will be, based on the following (unless agreed in writing by one of our partners):

- We will assume we can take instructions from you or anyone else from White Oak Global Advisors, LLC or anyone else you tell us has authority to give us instructions; or if we act for more than one person, from any of those persons on behalf of all of you.
- You and any others with whom we need to liaise provide prompt, clear and accurate instructions and provide relevant information (whether or not we ask for it) in English and tell us promptly of any changes. We may act on your oral instructions but we may ask you to confirm these in writing.
- Where the matter involves negotiation, those negotiations are conducted by all parties on a reasonable and professional basis and are not unduly protracted.
- That there are no circumstances outside our control that delay the timely progress and conclusion of the matter.
- That you pay our bills within 30 days of being rendered.
- We are not required to do work that is outside any scope that one of our partners agrees to in writing.
- We will not have to travel outside London.

9 **LIMITATION OF OUR LIABILITY**

Our liability for loss or damage attributable to our negligence, breach of contract, misrepresentation or otherwise (but not in respect of fraud, fraudulent misrepresentation, death or personal injury) shall

CharlesRussell
Speechlys

not exceed £30,000,000 per single originating cause (or, if higher, such minimum level of insurance cover as the Solicitors Regulation Authority requires us to maintain from time to time).

A limitation of liability provision in these terms shall apply to each and every subsequent transaction or work we carry out for you unless we agree otherwise.

Where this letter is addressed to more than one client, this limit of liability applies to the total of all claims by all such clients and not separately to each client.

If the matter involves tax mitigation planning, our advice is based on our understanding of the current law and HMRC's current practice. We shall therefore not be liable for any loss or damage suffered by you arising from changes to the law or its interpretation (and we do not undertake to alert you to any such changes) or changes in your circumstances after the date on which the advice was first given. It is also not possible for us to guarantee that any tax mitigation planning steps taken will be successful and we shall not, therefore, be liable for any loss or damage suffered by you if and to the extent that they may not succeed. This includes, but is not limited to, any loss or damage arising as a result of the application of the General Anti-Abuse Rule (GAAR), the purpose of which is to counteract abusive tax arrangements.

10 **COMPLAINTS**

We undertake to look into any complaint about our services or our bill, carefully and promptly and to do all we can to explain the position to you. If we have given you a less than satisfactory service, we will do everything reasonable to put it right. We have a complaints procedure, a copy of which is available on request. Further information is given in the *Complaints Procedure paragraph* in the Standard Terms concerning any complaint to us or to the Legal Ombudsman.

11 **CLIENT UPDATES**

By accepting our terms of engagement you agree to us using your contact details to inform you of legal updates, client seminars and the like. If you do not wish to receive that information, please write to the Data Protection Officer at our address or tick the box in any communication you receive from us containing such information.

Please contact me if you require clarification of anything in this letter. Please confirm your agreement to our terms of engagement by signing and returning the enclosed copy of this letter. Meanwhile your continued instructions will amount to your acceptance of these terms.

We look forward to working with you.

Yours sincerely

Hamish Perry

**Hamish Perry**
Partner
for and on behalf of Charles Russell Speechlys LLP

CRS
CharlesRussell Speechlys

We agree to the terms of engagement set out in this letter, any attachments and the Standard Terms.

..........................................................................................

for and on behalf of **White Oak Global Advisors LLC**

Date: January 6, 2016

**STANDARD TERMS**

**(VERSION DATED 9/7/2015)**

**Introduction**

Charles Russell Speechlys LLP is a limited liability partnership under the Limited Liability Partnerships Act 2000 (with registered number OC 311850 and with its registered office at 5 Fleet Place, London EC4M 7RD). A list of our members is available at our registered office. We are authorised and regulated by the Solicitors Regulation Authority of England and Wales ("SRA"). The SRA Code of Conduct can be accessed at www.sra.org.uk.

1 **OUR SERVICES**

1.1 Our agreement to provide our services is effective from the earlier of:

1.1.1 the date of the Letter of Engagement; and

1.1.2 our beginning to render the services.

1.2 We will carry out our services with reasonable skill and care.

1.3 Unless we otherwise specifically agree in writing:

1.3.1 Our services and the products of our services are provided only to you for the purpose set out in the Letter of Engagement.

1.3.2 You may not disclose the products of our services or make the benefit of our services available to anyone else except:

(a) as may be set out in the Letter of Engagement, or

(b) where required by law, or

(c) (if you are a company) to any other member of your group, or

(d) to your other professional advisers

provided that in the case of (c) and (d) you first tell them in writing that we do not accept or assume any liability or duty to them and that no further use or disclosure may be made.

1.4 Our responsibility is only to you as our client. We shall not be under a duty to, nor have any responsibility towards, any other person in connection with the work we have agreed to undertake (unless that person is also a client in relation to the work), even if your intention is to benefit such a person. Except to the extent that our partners, employees and consultants can benefit under the paragraph entitled "Claims" below, the Contracts (Rights of Third Parties) Act 1999 does not apply to this agreement.

1.5 If we have a liability to you under this agreement for any loss or damage (including costs) and one or more other advisers would be liable to you for the same loss or damage except that the contract with any such adviser excludes or limits that liability, or you decide not to recover or are unable for any reason to recover from any such other adviser, then:

1.5.1 our liability to you for that loss or damage will be reduced;

1.5.2 the reduction will take into account the responsibility of such one or more other advisers for the loss or damage;

CharlesRussell Speechlys

1.5.3 in determining the extent of any other adviser's responsibility, no account will be taken of any shortfall in recovery from any other adviser for whatever reason or any exclusion or limit on the amount payable by that adviser (whether or not we are aware of it).

1.6 Where we agree to accept service of documents on your behalf and do not agree specific terms and conditions for so acting, our obligations are only to use reasonable care to forward the document to you at your risk, or communicate to you the fact of its receipt by us, as promptly as reasonably possible at the address we last have for you. We will not be bound to consider the urgency or importance of the document or advise you concerning it (unless we have specifically agreed to do so). Nor shall we be liable for any delay or failure in communication due to circumstances beyond our control or be required to act in any respect contrary to law or to our professional obligations as solicitors. We may terminate our agreement to accept service on not less than one month's written notice to you subject to the Civil Procedure Rules of the English Courts if we are also on the court record.

1.7 We shall not be liable for any delay in performing or inability to perform our services or obligations as a result of circumstances outside our reasonable control or our compliance with any anti-money laundering or counter terrorist financing legislation.

1.8 We are legal advisers and it is not part of our role to advise on business or financial matters. Nor will we advise on any tax related aspects of a matter unless we specifically agree in writing.

1.9 We are not responsible for reviewing now or in the future any advice given or work undertaken for you in the light of any changes in the law subsequent to our having given the advice or having undertaken the work, unless it is part of the agreed scope of our work on a particular matter.

## 2 CONFIDENTIALITY

2.1 Except as explained below, we will maintain our professional and legal obligations of confidentiality in relation to the work we undertake for you and in relation to information, which is confidential to you, is not already in the public domain or known to us and which comes into our possession in the course of undertaking that work. However, we may disclose such information:

2.1.1 for the purpose of acting for you including, without limitation, disclosures to your other advisers or to third parties involved in the work we are undertaking for you;

2.1.2 to our auditors for the purposes of the audit of our accounts;

2.1.3 to our professional indemnity insurers in accordance with the requirements of that insurance (which may include communications which would ordinarily be protected by legal professional privilege);

2.1.4 as required by law or by any regulatory authority or court of competent jurisdiction;

2.1.5 for the purposes of complying with our obligations under any anti-money laundering or counter terrorist financing legislation; or

CharlesRussell Speechlys

2.1.6 to assist with the management of our business including recovery of unpaid bills and for the purpose of outsourcing any of our services, but any person to whom such disclosure is made will be required to maintain the confidentiality of the information.

3 **ELECTRONIC COMMUNICATION**

3.1 We may correspond by means of electronic mail.

3.2 Both you and we agree to use commercially reasonable procedures to check for commonly known viruses before sending information electronically, but you and we recognise that such procedures cannot guarantee that transmissions will be virus free.

3.3 You accept the risks of using electronic mail, including but not limited to the risks of viruses, interception, unauthorised access, delay, mis-routing and breakdown of service providers.

3.4 Electronic mail may be monitored for regulatory compliance purposes.

3.5 We endeavour to retain, in electronic storage or hard copy, copies of all emails which contain or refer to significant information, although others may be deleted or destroyed. However it may be impractical or unjustifiably time consuming to retain all such emails and your file may therefore not contain a copy of every email sent or received.

4 **INTELLECTUAL PROPERTY RIGHTS**

All intellectual property rights worldwide in the products of our services will be owned by us. You will have a non-exclusive non-transferable licence to use those products for your own internal purposes.

5 **YOUR MONEY**

5.1 Any money we hold for you will be deposited with a bank or building society having requisite UK authorisation or EEA equivalent authorisation in each case in accordance with the requirements of the SRA Accounts Rules for holding client money. We make no representation as to the financial position of any such bank or building society and we will not be responsible for any loss or damage due to any mistake by or insolvency of any such bank or building society or any delay or failure by it to pay or repay monies deposited with it.

5.2 Unless otherwise agreed with you, we will account to you for any interest exceeding £20 earned on cleared funds held by us for you in our general client account with our principal bankers. The interest rate will be equivalent to the relevant bank's published rates for client business accounts. Interest on money held in a separate designated client account will be at the rate paid by the bank concerned. Details will be provided on request. Interest will usually be credited following the conclusion of the matter. However we may pay interest at appropriate intervals if the matter is ongoing over a long period. Further information about money we hold for clients may be placed on our website from time to time.

5.3 It is our normal practice that any gains or losses resulting from currency conversion into sterling of bills rendered in another currency, accrue to us. However, we reserve the right to require payment of any currency conversion loss we suffer where payment is not made within our normal 30 day period after the bill is rendered.

CRS
CharlesRussell Speechlys

5.4 You agree that we may apply any funds in our client account that are not held for a specific purpose towards the discharge of outstanding bills.

## 6 GUARANTEE OR AGREEMENT FOR PAYMENT OF COSTS

A guarantee or agreement by a third party for payment of our bill does not release you from your primary responsibility for payment if the third party does not pay promptly on request. If you have arranged with a third party for that third party to pay our bill, the third party will not normally be entitled to recover any VAT element and you will remain liable for that.

## 7 PAYMENT OF BILLS

7.1 If any bill is not paid within 30 days after it is delivered or any request for a payment on account is not met, we reserve the right:

7.1.1 to suspend carrying out our services; and/or

7.1.2 to terminate our retainer on written notice to you; and/or

7.1.3 to charge interest at 8% p.a. or if the amount is recovered following the issue of court proceedings at the rate payable on judgment debts; and/or

7.1.4 to remove our name from the court record in any proceedings in which we are acting for you.

7.2 English law imposes a tax charge on UK resident but foreign domiciled individuals when they remit untaxed foreign income or gains to the UK. In certain circumstances the payment of our bill from foreign untaxed income or gains may be treated as such a remittance, giving rise to a UK tax liability. The liability can arise not only where the individual pays our bill out of his or her own funds, but also where the payment is made by a company in which he or she has a significant interest or by a non-resident trust in which he or she has an interest. The rules are technical and complex. We shall not advise on or be under any obligation concerning the tax consequences of payment of our bills unless we have agreed to do so in our Letter of Engagement.

7.3 Subject to compliance with money laundering regulations we will accept, for the convenience of clients, most major credit and debit cards for payment of our bills. Please ask for details.

We will not normally accept payment in cash. If we do it will only be in exceptional circumstances agreed in advance with you for limited amounts and only in respect of our charges.

## 8 ANTI MONEY LAUNDERING

We are required to undertake due diligence measures concerning our clients and this may include asking for evidence of your identity and obtaining information about persons who have significant interests in or control over the management of certain types of client. We may charge for doing this based on our hourly rates. We may use an on-line identity verification service and supply relevant personal data and other identifying details about you to the provider of that service. Where that information relates to another person you confirm you have that person's authority to provide it. Until our due diligence is completed, we may be unable to undertake any work and to receive payments. If we begin acting pending completion of due diligence, we may have to cease acting if this is not completed within the time limits we advise.

In accordance with anti money laundering legislation and our own

CRS
CharlesRussell Speechlys

procedures, where knowledge or suspicion of money laundering, terrorist financing or sanctions issues arise, we may be obliged to cease or suspend acting and/or report information to the appropriate authorities, possibly without telling you or explaining why.

## 9 INVESTMENT ADVICE

Our work may involve investments. Although we are not authorised under the Financial Services and Markets Act 2000 or by the Financial Conduct Authority, we are able, in certain circumstances, to offer a limited range of investment services to clients because we are members of The Law Society of England and Wales, which is a designated professional body for the purposes of the Financial Services and Markets Act 2000. Complaints and redress mechanisms are provided through the SRA and the Legal Ombudsman. We can provide these investment services where they are an incidental part of our professional services.

## 10 INSURANCE MEDIATION ACTIVITY

We are not authorised by the Financial Conduct Authority. However, we are included on the register maintained by the Financial Conduct Authority so that we can carry on insurance mediation activity, which is broadly the advising on, selling and administration of insurance contracts. This part of our business including arrangements for complaints or redress if something goes wrong, is regulated by the SRA. The register can be accessed via the Financial Conduct Authority Website at http://www.fca.org.uk/register.

## 11 CONFLICTS OF INTERESTS

It is our practice to check for conflicts of interest before taking on work. We provide many different professional services to clients and although we carry out searches we may not identify all situations where there may be a conflict of interest. Therefore, please notify us promptly of any potential conflict which you think exists or may exist. In appropriate cases it may be that your interests can be properly safeguarded through information barriers which where possible will be agreed with you.

## 12 DATA PROTECTION

12.1 All information that we hold concerning individuals will be dealt with in accordance with the provisions of the Data Protection Act 1998. Such data will be used by us for the provision of our legal services and for related purposes. We will not, without the appropriate consent, supply individual names and addresses to any third party except:

12.1.1 where this is a necessary part of the legal services that we undertake; or

12.1.2 where we are required to do so by operation of law; or

12.1.3 for the purposes of anti-money laundering identity checks and credit checks; or

12.1.4 to help us manage our business.

12.2 An individual has certain rights under the Data Protection Act 1998 to obtain information we hold about him or her, including a description of the personal data that we hold. If you have any queries concerning these rights, please contact our Data Protection Officer.

12.3 We may include documents created or received in the course of providing our services in databases that we use or maintain, and use them for the purposes of our business. Those

CRS
CharlesRussell Speechlys

databases may comprise hard copy documents stored and retrieved manually or electronically. We shall regard your acceptance of these terms as your agreement to this.

12.4 We use the information you provide (including personal data) primarily for the provision of legal services to you, but also for related purposes including creating and maintaining client records, issuing invoices, collecting payments and debts, analysis for the purpose of practice management, statutory returns, insurance proposals and legal and regulatory compliance. Our work for you may require us to share information with third parties such as other advisers or persons in our associated offices.

12.5 We may use third parties, within or outside the European Economic Area to perform certain support and legal services on our behalf in relation to your matter such as word-processing, copying, printing, translation, conveyancing, legal research and corporate due diligence services. The work which is outsourced may include sensitive personal data as defined in the Data Protection Act 1998.

12.6 We will take appropriate measures to maintain client confidentiality by ensuring that third parties providing support services and legal services, will have signed a confidentiality agreement and agreed to act as a data processor in respect of any personal data in terms which enable us to comply with the Data Protection Act 1998.

12.7 If you visit our website, we will use cookies to monitor aspects of your use of our website. Cookies are small data files which are stored on your computer or mobile device. We only use a limited number of temporary cookies and we comply with your rights under the Privacy and Electronic Communications (EC Directive) (Amendment) Regulations 2011. Your acceptance of these terms of engagement will be treated as your consent to our use of such cookies. For further information. please refer to our privacy policy which is available on our website.

## 13 INSIDE INFORMATION

If you are required to comply with the inside information provisions of the Disclosure Rules and Transparency Rules published by the Financial Conduct Authority and where we have access to any information which we consider to be, or you advise us constitutes, inside information (as defined in the Disclosure Rules and Transparency Rules), we will maintain a list of those partners, employees and consultants of ours who are acting on the transaction or may otherwise have access to the inside information (an "insider list"). You agree to notify us when you provide information to us which is inside information.

We will provide you with a copy of the insider list as soon as reasonably practicable if you ask us to do so. We will also provide a copy to the Financial Conduct Authority, the Law Society or SRA if so required.

The insider list will be stored and kept for five years from the date on which it is last edited. During storage, it will be readily obtainable if required. Unless you instruct us to the contrary, the insider list will be destroyed at the expiration of the five year period.

## 14 OTHER ADVISERS

If we propose to instruct other professional advisers on your behalf, we will tell you of the adviser we intend to use (if you do not have an existing or preferred adviser) and ask them to provide you with an estimate of their costs for which you will be directly liable. Please note that, although we may recommend an adviser with which

CharlesRussell Speechlys

we have previously worked, any such adviser will be independent of Charles Russell Speechlys LLP, will be instructed on your behalf and will not act as our agents.

We assume no responsibility or liability for advice given to you or otherwise in respect of the information supplied or work undertaken by any such adviser or by any other adviser with whom we may work in relation to our services, whether recommended by us or suggested or instructed by you. Unless you otherwise advise us in writing, we will assume that we are authorised to communicate information (whether confidential to you or not) to such advisers for the purpose of their work.

15 **CLIENT SATISFACTION / COMPLAINTS PROCEDURE**

15.1 Satisfying your requirements and expectations requires not only a professional approach on our part, but also that we should be kept aware of any concerns that you have about our work or about the progress of your matter. We therefore hope that you will raise any such concerns promptly and frankly, and indeed tell us of any suggestions to improve our services. To that end we have internal systems of quality control, including periodic reviews of our service.

15.2 Any complaint you may have in relation to our services, which may include a complaint about an invoice, should be raised in the first instance with the Partner responsible for your matter. He or she may seek the assistance of the Firm's Complaints Partner or others in trying to resolve the matter with you. Alternatively, if either at the outset, or if you and the Partner cannot resolve your complaint, you wish to make a complaint under our Complaints procedure or if your complaint relates to that Partner, please write to the Firm's Complaints Partner (currently Jonathan Whitehead), who has been appointed to try to resolve disagreements between the Firm and its clients. He will acknowledge your complaint in writing, explain to you the procedure that he will follow to investigate the matter and will conduct a full review. That may involve delegating responsibility for the investigation to another partner.

15.3 If you remain dissatisfied after receiving our final response to your complaint (including a complaint relating to an invoice) you can contact the Legal Ombudsman as follows:

- post: PO Box 6806 Wolverhampton WV1 9WJ; or
- email: enquiries@legalombudsman.org.uk; or
- telephone: 0300 555 0333 or if calling from overseas +44 121 245 3050.

15.4 If you wish to refer a complaint to the Legal Ombudsman. it should be done within twelve months of our final response to your complaint; and within six years of the act or omission that caused the complaint or if outside this period, within three years of when you should reasonably have known about the relevant act or omission.

15.5 The Legal Ombudsman has restricted the categories of clients who are eligible to complain to it. Broadly speaking, a complainant must be an individual (including trustees, personal representatives and beneficiaries of estates), a small business or a charity or club with an annual net income of less than £1 million. For further guidance please refer to the Legal Ombudsman Scheme Rules.

15.6 If you wish to make a complaint relating to a bill, you must do so within one month of receiving the bill, failing which we will be under no obligation to investigate or to attempt to resolve the complaint. You may also have the right to apply to the court for assessment of the bill under Part III of the Solicitors

CRS CharlesRussell Speechlys

Act 1974, or Part 48 of the Civil Procedure Rules 1999 normally within twelve months of delivery of the bill. The Legal Ombudsman may decline to consider your complaint if you have applied to the court for assessment of the bill.

15.7 No charge will be made for the time spent in investigating and responding to a complaint.

16 **CLAIMS**

16.1 Our partners, employees and consultants do not owe a personal duty of care or take personal responsibility for their acts or omissions in connection with the work they do. That work is undertaken on our behalf and not in their individual capacity.

16.2 You agree not to bring any claim in respect of loss or damage suffered by you out of or in connection with our services against any of our partners, employees or consultants. This restriction will not operate to limit or exclude our liability for the acts or omissions of any partner, employee or consultant. It is agreed that any partner, employee or consultant will have the right to enforce this clause pursuant to the Contracts (Rights of Third Parties) Act 1999, but their consent is not required to any variation, termination or rescission of this agreement.

16.3 However, nothing in these Standard Terms or in the Letter of Engagement excludes or limits any claim you may have against a member, employee or consultant of ours for fraud or for death or personal injury caused by that person's negligence.

16.4 Contact details of our professional indemnity insurer and details of territorial coverage of the insurance are available from our General Counsel or Director of Risk at our registered office.

17 **STORAGE OF PAPERS AND DOCUMENTS**

17.1 On completion of our work, following payment of all our bills on all matters for you, any original documents or other property which belongs to you and which we hold will be returned, if you so request. Files or records of our work will be kept for at least seven years and may be placed in third party storage and/or scanned and/or stored electronically. If we scan or store documents electronically we may also destroy the originals, unless they are documents of title or documents having an intrinsic status or value deriving from a factor other than their content.

17.2 Unless we have agreed otherwise in writing, you authorise us to destroy all files or records of our work seven years after the date of our final invoice for the work concerned.

17.3 If we retrieve files or documents from storage in relation to continuing or new instructions, we will not normally charge for such retrieval. However we may make a reasonable charge in other circumstances.

18 **TERMINATION**

You may terminate your instructions to us at any time. We may only stop working for you for good reason and on reasonable notice or as set out in the Letter of Engagement. If the agreement is terminated by you or us, unless the Letter of Engagement states otherwise, you will only be liable for our fees until termination plus VAT and other charges, expenses and disbursements.

We will be entitled to retain all your files and documents while there is money owing to us on any matter.

Any provisions of this agreement which are capable of having effect after termination, shall do so.

CharlesRussell Speechlys

19 **LEGAL PROFESSIONAL PRIVILEGE**

Communications between a lawyer, acting in his or her capacity as a lawyer, and a client are privileged if they are both: (a) confidential; and (b) made for the purpose of seeking or giving legal advice (legal advice privilege). Confidential communications between a lawyer and a client, a lawyer and an agent or a lawyer and a third party will also be privileged if they are made after litigation proceedings have commenced or are reasonably in prospect and the communications are for the sole or dominant purpose of litigation (litigation privilege). You should be aware that if it is necessary for us to communicate with third parties on your behalf, those communications are unlikely to be privileged unless litigation privilege applies. Where legal advice privilege is concerned, the courts may treat individuals within your own organisation as external third parties if they are not involved in the giving of instructions or in the seeking, obtaining or receipt of advice from us. If you decide to disseminate privileged documents, either internally or externally, privilege may be lost so you should discuss this with us first. The law is not clear on whether legal advice privilege can exist in communications with clients made by non lawyers working for us.

20 **GOVERNING LAW AND JURISDICTION**

Unless our Letter of Engagement states otherwise, our agreement with you will be governed by English Law and will be subject to the exclusive jurisdiction of the Courts of England.

21 **WHOLE AGREEMENT**

21.1 The Letter of Engagement, these Standard Terms and any other terms expressly agreed at any time in writing by a partner of ours, set out the entire agreement between us for the work you have instructed us to do. If you instruct us to carry out additional work and we do not prepare a separate Letter of Engagement, this agreement will continue to apply, modified to reflect the scope of the additional work which will be carried out at our then hourly rates for the individuals concerned, unless we agree otherwise in writing.

21.2 If any part of the covering Letter of Engagement or these Standard Terms is or shall become invalid, illegal or unenforceable, the remainder shall survive unaffected.

21.3 The headings to paragraphs in the Letter of Engagement and these Standard Terms shall be ignored in construing the paragraphs.

22 **INTERPRETATION**

In the agreement the following words and expressions shall have the following meanings:

**"we", "our", "ours"**

means Charles Russell Speechlys LLP and where the context so admits our associated Swiss law firm Charles Russell Speechlys AG any company owned or controlled directly or indirectly by Charles Russell Speechlys LLP or any other corporate entity or partnership in which Charles Russell Speechlys LLP has a direct or indirect financial interest and any successor practice of any of the foregoing.

**"you", "your"**

means the parties to the agreement other than us.

**"the/our/this agreement"**

means the Letter of Engagement, these Standard Terms and any other

CharlesRussell Speechlys

terms expressly agreed at any time in writing by a partner of ours.

**"Letter of Engagement"** or **"Engagement Letter"**

means the letter from us or other written agreement by us recording the terms of our engagement in relation to your matter.

**"services"**

means the services described in the Letter of Engagement or otherwise agreed between us in writing.

Any reference in the context of the provision of our services, to a "partner" of ours means a member of ours or an employee or consultant with equivalent standing and qualifications. It does not mean that our members and/or any person referred to as a "partner" are carrying on business in partnership. Also, any reference to any employee or consultant of ours shall include a reference to an employee or consultant of any subsidiary of ours.